1 | LAURA E. DUFFY
United States Attorney
2 | BRUCE C. SMITH
Assistant U.S. Attorney
3 | California State Bar No. 078225
Federal Office Building
4 | 880 Front Street, Room 6293
San Diego, California 92101-8893
5 | Telephone: (619) 546-8266
E-mail: bruce.smith@usdoj.gov
6
7 | Attorneys for Plaintiff
United States of America

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | UNITED STATES OF AMERICA,        Case No. **'15CV1925 H    RBB**

11 |                 Plaintiff,       COMPLAINT FOR
                                     FORFEITURE
12 |       v.

13 | $959,333.87,

14 |                 Defendant.

15

16   By way of complaint against the defendant,

17 $959,333.87 ("$959,333"), the United States of

18 America alleges:

19   1. This Court has jurisdiction over this action by

20 virtue of the provisions of Title 28, United States Code,

21 Section 1355, and Title 21, United States Code,

22 Section 881(a)(6), because the defendant $959,333

23 constitutes proceeds traceable to an exchange for

24 controlled substances in violation of Chapter 13 of

25 Title 21, United States Code.

26   2. This Court has jurisdiction over this action by

27 virtue of the provisions of Title 28, United States Code,

28 Section 1355, and Title 18, United States Code,

USAO:2013V00253:BCS/th

Section 981, because the defendant $959,333 constitutes property involved in a transaction and series of transactions executed in furtherance of a money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h).

3.   Venue is proper in this district pursuant to Title 28, United States Code, Section 1395 because the defendant $959,333 was found and seized in this district.

4.   On or about June 2, 2015, in the Southern District of California, agents of the Drug Enforcement Administration ("DEA") seized the defendant $959,333 pursuant to a seizure warrant issued by a U.S. Magistrate Judge in the Southern District of California. When seized, the defendant $959,333 was in the form of a check issued by the escrow company and thereafter deposited into the U.S. Marshal seized asset account.

5.   The defendant $959,333 constitutes the net proceeds to seller from the sale, on or about May 29, 2015, of the single family residence known as 3158 Via Viganello, Chula Vista, in the Southern District of California ("3158 Via Viganello").

A.   The title holder and person who executed the deed transferring the property was Claudia Zazueta Huizar ("Zazueta Huizar").

B.   The source of all funds used by Zazueta Huizar to acquire title to 3158 Via Viganello was Eduardo Diaz Garcia ("Diaz Garcia"), a career trafficker of controlled substances.   The real property and its

2

subsequent sales proceeds therefore represented proceeds from the illegal sales and distribution of controlled substances in violation of Chapter 13 of Title 21, United States Code and subject to forfeiture to the United States pursuant to Title 21, United States Code, Section 881.

6. In January 2009, DEA agents based in the Southern District of California identified Diaz Garcia, a citizen of Mexico, as a person actively engaged in the distribution and sales of controlled substances in the Southern District of California and elsewhere.

A. During all times alleged herein, Zazueta Huizar and Diaz Garcia held themselves out and identified themselves as being married.

7. On July 28, 2010, in the Southern District of California, DEA Special Agents Dir and Swartz spoke with a cooperating individual ("CI") who had recently been convicted in the California State Superior Court of transporting large sums of drug sales proceeds in the form of U.S. currency.

A. The CI was familiar with individuals in leadership positions in a Sinaloa, Mexico-based drug trafficking organization "DTO."

B. The DTO was a criminal organization engaged in the international distribution and sales of controlled substances.

C. The DTO conducted phases of its international illegal drug distribution operations in,

3

among other places, the Mexicali, Baja California and Culiacan, Sinaloa regions of Mexico.

   D.   DEA Special Agents Dir and Swartz were familiar with some members of the DTO.

   E.   The CI told DEA Agents Dir and Swartz that Diaz Garcia was a member of the DTO, and that he distributed throughout the United States multiple kilograms of cocaine weekly. Cocaine is a Schedule II Controlled Substance.

   F.   The CI told DEA Agents Dir and Swartz that Diaz Garcia smuggled multiple kilogram amounts of cocaine into the United States from Mexico through the port of entry "POE") at Calexico in the Southern District of California, as well as the POE San Luis and POE Nogales, Arizona.

   8.   Diaz Garcia and his brother, Jose Diaz Garcia, were the principal members of a Sinaloa-based DTO organization that smuggled multi-kilogram quantities of cocaine and heroin into the United States from Mexico. Heroin is a Schedule I Controlled Substance.

   A.   One of Diaz Garcia's primary sources of supply for cocaine and heroin was Ricardo Sanz Kanagui, based in Mexicali, Mexico.

   B.   Jose Diaz Garcia coordinated with a host of smugglers to covertly introduce multiple kilogram amounts of cocaine and heroin into the United States from Mexico.

   C.   The smugglers who transported Diaz Garcia's cocaine and heroin would ultimately deliver it to Juan

4

Carlos Andrade and his associates in Central District of California.

D. Diaz Garcia and Eduardo Diaz Garcia oversaw and directed the smuggling, transportation, and distribution of cocaine and heroin.

9. In January 2013, DEA agents identified Diaz Garcia's residence as a luxury condominium located at 325 Seventh Avenue, Unit 2003, San Diego, in the Southern District of California ("325 Seventh Avenue #2003").

10. DEA agents investigated 325 Seventh Avenue #2003 and learned that on or about November 19, 2010, Zazueta Huizar purchased the condominium for approximately $899,000.00 in cash.

11. DEA agents investigated the manner in which Zazueta Huizar funded the purchase of 325 Seventh Avenue #2003.

12. Beginning on a date unknown to the United States, and continuing up and including November 18, 2010, and for the purpose of facilitating the purchase of 325 Seventh Avenue #2003, Diaz Garcia and Zazueta Huizar did knowingly combine, conspire, and agree with other persons known and unknown to the United States to commit violations of Title 18, United States Code, Section 1956(h).

13. During the course of purchasing 325 Seventh Avenue #2003, Diaz Garcia, Zazueta Huizar, and others known and unknown to the United States knowingly conducted and attempted to conduct financial transactions

affecting interstate and foreign commerce, that is to execute and cause to be executed transfers of United States currency, which involved the proceeds of specified unlawful activity, that is, the illegal distribution of controlled substances, knowing that such transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

14. Between the dates of September 30, 2010 and November 18, 2010, a series of 10 wire transfers were deposited into the escrow account opened and maintained to facilitate the purchase of 325 Seventh Avenue #2003 by Zazueta Huizar.

A. On or about September 30, 2010, acting on instructions from Diaz Garcia, Frederico Ortega Lopez transferred or caused to be transferred $27,000.00 into Zazueta Huizar's escrow account.

B. On or about October 22, 2010, acting on instruction from Diaz Garcia, Carlos Morales Gastelum ("Morales") transferred or caused to be transferred $100,000.00 into Zazueta Huizar's escrow account.

C. On or about October 27, 2010, acting on instructions from Diaz Garcia, Morales transferred or

caused to be transferred $100,000.00 into Zazueta Huizar's escrow account.

D. On or about October 29, 2010, acting on instruction from Diaz Garcia, Morales transferred or caused to be transferred $100,000.00 into Zazueta Huizar's escrow account.

E. On or about November 9, 2010, acting on instructions from Diaz Garcia, Morales transferred or caused to be transferred $195,000.00 into Zazueta Huizar's escrow account.

F. On or about November 10, 2010, acting on instructions from Diaz Garcia, Morales transferred or caused to be transferred $150,000.00 into Zazueta Huizar's escrow account.

G. On or about November 12, 2010, acting on instructions from Diaz Garcia, Morales transferred or caused to be transferred $100,000.00 into Zazueta Huizar's escrow account.

H. On or about November 17, 2010, acting on instructions from Diaz Garcia, Morales transferred or caused to be transferred $60,000.00 into Zazueta Huizar's escrow account.

I. On or about November 18, 2010, acting on instructions from Diaz Garcia, Morales transferred or caused to be transferred $70,000.00 into Zazueta Huizar's escrow account.

J. On or about November 18, 2010, acting on instructions from Diaz Garcia, Morales transferred or

1  caused to be transferred $50,000.00 into Zazueta Huizar's

2  escrow account.

3        K.   A total of $952,000.00 was wire transferred

4  into Zazueta Huizar's escrow account by third parties

5  acting in instructions from Diaz Garcia.

6        L.   At the close of escrow, due to the excess

7  amount of funds wired into escrow account, Zazueta Huizar

8  received a refund of approximately $45,762.57.

9     15. All of the funds wire-transferred into Zazueta

10  Huizar's escrow account represented proceeds from the

11  illegal sales and distribution of controlled substances

12  by Diaz-Garcia and his criminal affiliates.

13    16. On or about November 15, 2010, Diaz Garcia and

14  Zazueta Huizar signed and submitted to the escrow company

15  handling the purchase of 325 Seventh Avenue #2003 a

16  document entitled "Interspousal Transfer Grant

17  Deed Instructions."

18        A.   The signed and executed Interspousal

19  Transfer Grant Deed Instructions document conveys, among

20  other things, Diaz Garcia's consent that Zazueta Huizar

21  may hold title to 325 Seventh Avenue #2003 as a married

22  woman as her sole and separate property.

23        B.   By recording title to 325 Seventh Avenue

24  #2003 under Zazueta Huizar's name as her "sole and

25  separate property", Diaz Garcia sought to conceal his

26  interest in the property from law enforcement and to

27  prevent its forfeiture to the United States.

28

17. On or about November 19, 2010, a grant deed was recorded for 325 Seventh Avenue #2003, reflecting Zazueta Huizar as the sole owner, holding title as a married woman as her sole and separate property.

18. On September 17, 2014, at the POE Calexico, California, Zazueta Huizar was interviewed by DEA Agents Borkowski and Castanon regarding the purchase in 2010 of 325 Seventh Avenue #2003.

A.   Zazueta Huizar stated she had not been employed since 2002.

B.   In 2010, when Zazueta Huizar purchased 325 Seventh Avenue #2003, she had no money in Mexico or in the United States.

C.   Zazueta Huizar learned about the planned purchase of 325 Seventh Avenue #2003 when Diaz Garcia told her that he was buying a condominium in San Diego.

D.   The DEA agents showed Zazueta Huizar documents memorializing and chronicling the series of wire transfers into the escrow account for the purchase of 325 Seventh Avenue #2003.

E. On September 30, 2010, Frederico Ortega Lopez transferred $27,000.00 into Zazueta Huizar's escrow account. Zazueta Huizar told the DEA agents she did not know Frederico Ortega Lopez, nor did she give him money to transfer into her escrow account.

F.   Zazueta Huizar stated the wire transfer executed by Frederico Ortega Lopez was made at the direction of Diaz Garcia.

G.   On and between October 22, 2010 and November 18, 2010, Morales, in a series of 9 wire transfers, deposited approximately $925,000.00 into Zazueta Huizar's escrow account.   Zazueta Huizar told the DEA agents she gave no money to Morales.

H.   Zazueta Huizar stated the wire transfers executed by Morales were made at the direction of Diaz Garcia.

19. During the time he resided at 325 Seventh Avenue #2003, Diaz Garcia would use the condominium as a place to conduct and oversee his illegal drug smuggling, transportation, and distribution operation.

20. During December 2013 and January 2014, Diaz Garcia arranged for the delivery of multiple kilos of cocaine and heroin to Juan Carlos Andrade ("Andrade") in the Central District of California.

A.   Andrade worked under the direction of Diaz Garcia as a principal distributor of cocaine and heroin in the Los Angeles, California area.

21. On or about January 20, 2014, investigating law enforcement agents knew that Diaz Garcia had recently delivered multiple kilograms of cocaine and heroin to Andrade in the Central District of California.

A.   Based upon information gathered during law enforcement surveillance of Andrade, and information developed during the investigation of Diaz Garcia, law enforcement officers in the Central District of California obtained search warrants for 2 residences

associated with Andrade from a judge of the California State Superior Court.

B. On or about January 20, 2014, law enforcement officers executed a search warrant at a residence located in 4500 block of West 172nd Street, Lawndale in the Central District of California, and seized approximately 3 kilograms of cocaine, 2 pounds of white heroin, and a 9mm handgun registered to Andrade.

C. On or about January 20, 2014, law enforcement officers executed a search warrant at a residence located in 200 block of East 158th Street, Gardenia in the Central District of California, and seized approximately 8 kilograms of cocaine and 4 pounds of white heroin.

22. On July 18, 2014, in the Central District of California, pursuant to an arrest warrant issued by a judge of the California State Superior Court, Andrade was arrested and taken into custody for, *inter alia*, violations of the Health and Safety Code pertaining to the sale and distribution of controlled substances.

A. Post arrest, Andrade told the arresting agents that since at least September 2013, he worked for Diaz Garcia distributing multiple kilograms of cocaine and heroin.

B. Andrade told the arresting agents that some of the cocaine and heroin distributed by Diaz Garcia was shipped to the State of Kentucky.

C.   Andrade told the arresting agents that some of the cocaine and heroin distributed by Diaz Garcia was shipped to an individual in Canada.

D.   Andrade told the arresting agents that on at least one occasion, in the Central District of California, Andrade received drug sales proceeds in the form of approximately $200,000.00 in U.S. currency.  Diaz Garcia instructed Andrade to transport the currency to a store in Calexico in the Southern District of California, and deliver it to an agent of Diaz Garcia.

E.   Andrade told the arresting agents that in September 2013, he was instructed by Diaz Garcia to travel to Boston, Massachusetts and pick up drug sales proceeds in the form of approximately $100,000.00. Andrade did as Diaz Garcia instructed.   Andrade transported the $100,000.00 in currency to the Central District of California, and delivered it to an agent of Diaz Garcia.

F.   Andrade told the arresting agents that on at least one occasion, he was instructed by Diaz Garcia to travel to Providence, Rhode Island and pick up drug sales proceeds in the form of approximately $150,000.00 in U.S. currency.   Andrade did as Diaz Garcia instructed. Andrade was further instructed to transport the currency to a store in Calexico in the Southern District of California, and deliver it to an agent of Diaz Garcia.

G.   Andrade told the arresting agents that on another occasion, he was instructed by Diaz Garcia to

travel to Providence, Rhode Island and pick up drug sales proceeds in the form of approximately $200,000.00 in U.S. currency. Andrade did as Diaz Garcia instructed. Andrade was further instructed to transport the currency to a store in Calexico in the Southern District of California, and deliver it to an agent of Diaz Garcia.

H. Andrade told the arresting agents that on another occasion, he was instructed by Diaz Garcia to travel to New Jersey and pick up drug sales proceeds in the form of approximately $109,000.00 in U.S. currency. Andrade did as Diaz Garcia instructed. Andrade was further instructed to transport the currency to a store in Calexico in the Southern District of California, and deliver it to an agent of Diaz Garcia. While transporting the currency to California, Andrade was stopped in Missouri by law enforcement, and the currency was seized for forfeiture.

23. During December 2013 and January 2014, Diaz Garcia coordinated the "laundering" of significant amounts of drug proceeds in the form of U.S. currency with Eduardo Enrique Larenas "Larenas."

A. Larenas purchased substantial quantities of cocaine and heroin from Diaz Garcia for distribution in the Eastern United States and Canada.

24. On or about November 8, 2013, Zazueta Huizar sold 325 Seventh Avenue #2003 for approximately $900,000.00.

1    A.    The net seller proceeds from the sale of 325

2 Seventh Avenue #2003 paid to Zazueta Huizar was

3 approximately $716,481.94.

4    B.    The purchase by Diaz Garcia and Zazueta

5 Huizar of 325 Seventh Avenue #2003 was funded by proceeds

6 from Diaz Garcia's sales and distribution of

7 controlled substances.

8    C.    The $716,481.94 received by Zazueta Huizar

9 at the close of escrow constituted proceeds from Diaz

10 Garcia's sales and distribution of controlled substances.

11   25. On or about December 19, 2013, after selling 325

12 Seventh Avenue #2003, Zazueta Huizar opened a residential

13 real estate escrow account and deposited $15,000.00

14 into it.

15   A.    The escrow account was created to facilitate

16 the purchase by Zazueta Huizar of the single family

17 residence known as 671 Via Maggiore, Chula Vista, in the

18 Southern District of California ("671 Via Maggiore").

19   B.    When Zazueta Huizar opened the escrow

20 account for the purchase of 671 Via Maggiore, the

21 property was listed for sale at a price of $1,525,000.00.

22   26. Beginning on a date unknown to the United

23 States, and continuing up and including January 22, 2014,

24 and for the purpose of facilitating the purchase of 671

25 Via Maggiore, Diaz Garcia and Zazueta Huizar did

26 knowingly combine, conspire, and agree with other persons

27 known and unknown to the United States to commit

28

14

violations of Title 18, United States Code, Section 1956(h).

27. During the course of attempting to purchase 671 Via Maggiore, Diaz Garcia, Zazueta Huizar, and others known and unknown to the United States knowingly conducted and attempted to conduct financial transactions affecting interstate and foreign commerce, that is to execute and cause to be executed transfers of United Stats currency, which involved the proceeds of specified unlawful activity, that is, the illegal distribution of controlled substances, knowing that such transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

A. Shortly after Zazueta Huizar opened the escrow account for the purchase of 671 Via Maggiore, Diaz Garcia began making arrangements for funds to be wire-transferred into the escrow account.

B. The funds Diaz Garcia made arrangements to wire-transfer into the escrow account constituted proceeds from his illegal cocaine and heroin distribution operation.

C. Diaz Garcia gave instructions to drug distributors and money launderers which whom he worked to deposit varying amounts of funds into the escrow account.

D. On or about January 7, 2014, from a location in Quebec, Canada, acting on instructions from Diaz Garcia, Larenas wire-transferred approximately $49,980.00 into the escrow account.

E. On or about January 7, 2014, from a location in Quebec, Canada, acting on instructions from Diaz Garcia, Larenas wire-transferred approximately $50,000.00 into the escrow account.

28. On or about January 22, 2014, the contract for the sale of 671 Via Maggiore to Zazueta Huizar was cancelled, and the escrow account was closed.

A. On January 23, 2014, the escrow company refunded $675,027.74 to Zazueta Huizar.

B. On February 11, 2014, the escrow company refunded the $50,000.00 wire transferred funds to the wire address of the original sender.

C. On February 14, 2014, the escrow company refunded the $49,980.00 to the wire address of the original sender.

29. After their failed attempt to purchase 671 Via Maggiore, Diaz Garcia and Zazueta Huizar resolved to purchase the single family residence known as 3158 Via Viganello, Chula Vista, in the Southern District of California ("3158 Via Viganello").

A.   On or about January 18, 2014, Zazueta Huizar opened a residential real estate escrow account and deposited $10,000.00 into it.

B.   The $10,000.00 deposited into the escrow account by Zazueta Huizar constituted proceeds from Diaz Garcia's sales and distribution of controlled substances.

C.   The escrow account was created to facilitate the purchase by Zazueta Huizar of 3158 Via Viganello.

D.   Zazueta Huizar ultimately purchased 3158 Via Viganello for cash at a price of $1,110,950.00.

E.   All of the funds used to purchase 3158 Via Viganello constituted proceeds from Diaz Garcia's sales and distribution of controlled substances.

30. Shortly after Zazueta Huizar opened the escrow account for the purchase of 3158 Via Viganello, Diaz Garcia began making arrangements for funds to be wire-transferred into the escrow account.

A.   The funds Diaz Garcia made arrangements to wire-transfer into the escrow account constituted proceeds from his illegal cocaine and heroin distribution operation.

31. Beginning on a date unknown to the United States, and continuing up and including March 28, 2014, and for the purpose of facilitating the purchase of 3158 Via Viganello, Diaz Garcia and Zazueta Huizar did knowingly combine, conspire, and agree with other persons known and unknown to the United States to commit

violations of Title 18, United States Code, Section 1956(h).

32. During the course of purchasing 3158 Via Viganello, Diaz Garcia, Zazueta Huizar, and others known and unknown to the United States knowingly conducted and attempted to conduct financial transactions affecting interstate and foreign commerce, that is to execute and cause to be executed transfers of United Stats currency which involved the proceeds of specified unlawful activity, that is, the illegal distribution of controlled substances, knowing that such transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B).

33. Between the dates of January 18, 2014 and March 28, 2014, a series of wire transfers, cash, and check deposits were made into Zazueta Huizar's personal bank account.

A. All of the funds wire-transferred and deposited into Zazueta Huizar's personal bank account during that period were made at the direction of Diaz Garcia, and all such funds constituted proceeds from the distribution of controlled substances by Diaz Garcia.

34. Between the dates of January 18, 2014 and March 28, 2014, Zazueta Huizar and other persons made a series of wire transfers, cash, and check deposits into the escrow account opened and maintained to facilitate the purchase of 3158 Via Viganello by Zazueta Huizar. All of the funds deposited constituted proceeds from the distribution of controlled substances by Diaz Garcia.

A. On January 22, 2014, at the direction of Diaz Garcia, a company known as Forest Fibers SL in Barcelona, Spain wire-transferred $49,970.00 into Zazueta Huizar's personal bank account.

B. On January 23, 2014, Ticor Title Company deposited $675,027.24 into Zazueta Huizar's personal bank account. Those funds represent the refund to buyer from the failed purchase of 671 Via Maggiore.

C. On January 24, 2014, at the direction of Diaz Garcia, Maurice Cabessa, at Toronto Dominion Bank, wire-transferred or caused to be wire-transferred $49,970.00 into Zazueta Huizar's personal bank account.

D. On January 30, 2014, Zazueta Huizar transferred or caused to be transferred $720,000.00 from her personal bank account into the escrow account for 3158 Via Viganello.

E. On February 3, 2014, at the direction of Diaz Garcia, Masum Quarashi, at Canadian Imperial Bank, wire-transferred or caused to be wire-transferred $59,980.00 into Zazueta Huizar's personal bank account.

F.   On February 4, 2014, at the direction of Diaz Garcia, Lim Kieng wire-transferred or caused to be wire-transferred $99,975.00 into Zazueta Huizar's escrow account.

G.   On February 6, 2014, Zazueta Huizar transferred or caused to be transferred $76,000.00 from her personal bank account into the escrow account for 3158 Via Viganello.

H.   On February 12, 2014, at the direction of Diaz Garcia, a company known as Wall Street Finance, at Bank of Montreal, wire-transferred or caused to be wire-transferred $15,535.00 into Zazueta Huizar's personal bank account.

I.   On February 12, 2014, at the direction of Diaz Garcia, Mahbub Rahman delivered a check to Zazueta Huizar, made payable to her in the amount of $10,000.00. Zazueta Huizar, in turn, deposited that check into her personal bank account.

J.   On February 19, 2014, Zazueta Huizar deposited drug distribution proceeds generated by Diaz Garcia, in the form of $8,000.00 in U.S. currency, into her personal bank account.

K.   On February 21, 2014, at the direction of Diaz Garcia, Masum Quarashi, at Canadian Imperial Bank, wire-transferred or caused to be wire-transferred $73,980.00 into Zazueta Huizar's personal bank account.

L.   On February 24, 2014, Zazueta Huizar transferred or caused to be transferred $100,000.00 from

her personal bank account into the escrow account for 3158 Via Viganello.

M. On February 28, 2014, Zazueta Huizar deposited drug distribution proceeds generated by Diaz Garcia, in the form of $9,000.00 in U.S. currency, into her personal bank account.

N. On February 28, 2014, Zazueta Huizar transferred or caused to be transferred $20,000.00 from her personal bank account into the escrow account for 3158 Via Viganello.

O. On March 7, 2014, Zazueta Huizar deposited drug distribution proceeds generated by Diaz Garcia, in the form of $5,000.00 in U.S. currency, into her personal bank account.

P. On March 10, 2014, Zazueta Huizar deposited drug distribution proceeds generated by Diaz Garcia, in the form of $3,000.00 in U.S. currency and a check made payable to Zazueta Huizar in the amount of $5,970.00 by a company known as Worldtalk, located in Jackson Heights, New York into her personal bank account.

Q. On March 11, 2014, Zazueta Huizar deposited drug distribution proceeds generated by Diaz Garcia, in the form of $3,830.00 in U.S. currency, and a check made payable to Zazueta Huizar in the amount of $4,200.00 by a company known as Worldtalk, located in Jackson Heights, New York into her personal bank account.

R. On March 17, 2014, Zazueta Huizar deposited drug distribution proceeds generated by Diaz Garcia, in

the form of $4,200.00 in U.S. currency, into her personal bank account.

    S.   On   March   18,   2014,   Zazueta   Huizar transferred or caused to be transferred $15,000.00 from her personal bank account into the escrow account for 3158 Via Viganello.

    T.   On March 28, 2014, at the direction of Diaz Garcia, Lim Kieng wire-transferred or caused to be wire-transferred   $79,975.00   into   Zazueta   Huizar's escrow account.

    35. On or about January 30, 2014, Diaz Garcia and Zazueta Huizar signed and submitted to the escrow company handling the purchase of 3158 Via Viganello a document entitled "Interspousal Transfer Grant Deed."

    A.   The   signed   and   executed   Interspousal Transfer Grant Deed document conveys, among other things, Diaz Garcia's consent that Zazueta Huizar may hold title to 3158 Via Viganello as a married woman as her sole and separate property.

    B.   By recording title to 3158 Via Viganello under Zazueta Huizar's name as her "sole and separate property", Diaz Garcia sought to conceal his interest in the property from law enforcement and to prevent its forfeiture to the United States.

    36. On or about March 28, 2014, Zazueta Huizar completed the purchase of 3158 Via Viganello, and paid $1,110,950.00 in cash.

37. On or about July 18, 2014, in the Southern District of California, Diaz Garcia was arrested by DEA agents, and booked into a San Diego County jail facility.

A. Diaz Garcia was charged before the California Superior Court, County of San Diego with violating, *inter alia*, Health and Safety Code Section 11352(a), sales of controlled substances.

B. Diaz Garcia pled guilty to violations of Health and Safety Code Section 11352(a), sales of controlled substances; and Penal Code Section 273a(a), child endangerment, both felonies.

C. On or about November 12, 2014, Diaz Garcia was sentenced to a term of custody in prison.

38. The DEA agents investigated Diaz Garcia from and during the years of 2009, through and until mid-2015.

A. Diaz Garcia was a career distributor of controlled substances.

B. During their investigation, the DEA agents detected no evidence that Diaz Garcia was engaged in any commercial or employment activities other than the smuggling and distribution of controlled substances.

39. On July 18, 2014, the day Diaz Garcia was arrested, the DEA agents interviewed Zazueta Huizar in her home.

A. Zazueta Huizar told the DEA agents that she and Diaz Garcia were married in 2002.

B.   Zazueta Huizar said that after being married to Diaz Garcia for approximately a year, she realized Diaz Garcia was a drug trafficker.

C.   Zazueta Huizar could not cite to or identify any other significant income sources for Diaz Garcia other than his income from drug trafficking.

40. On or about February 19, 2015, Zazueta Huizar accepted an offer to sell 3158 Via Viganello, and opened an escrow account.

41. On or about May 22, 2015, a U.S. Magistrate Judge in the Southern District of California issued a federal seizure warrant for the net seller proceeds from the sale of 3158 Via Viganello.

42. On or about May 29, 2015, the sale by Zazueta Huizar of 3158 Via Viganello was complete.  A grant deed naming a new owner was recorded, and escrow was closed.

43. Acting under the authority of the federal seizure warrant, DEA agents seized the defendant $959,333.87, in the form of a check payable to the U.S. Marshal Service.

A.   The defendant $959,333.87 constitutes the sum that would have otherwise been due and payable to Zazueta Huisar as net seller proceeds from the sale of 3158 Via Viganello.

44. The defendant $959,333.87 was seized for forfeiture to the United States.

Count 1

45. Paragraphs 1 through 44 are hereby incorporated herein as if alleged in full.

46. The defendant $959,333.87 constitutes proceeds of or proceeds traceable to multiple exchanges for controlled substances, in violation of Chapter 13, Title 21, United States Code.

47. As a result of the foregoing, the defendant $959,333.87 is liable to condemnation and to forfeiture to the United States for its use in accordance with Title 21, United States Code, Section 881(a)(6).

48. The defendant $959,333.87 in currency is presently deposited within the jurisdiction of this Court.

Count 2

49. Paragraphs 1 through 44 are hereby incorporated herein as if alleged in full.

50. The defendant $959,333.87 constitutes property involved in a transaction and series of transactions in furtherance of a money laundering conspiracy, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(1)(B) and 1956(a)(2)(B).

51. As a result of the foregoing, the defendant $959,333.87 is liable to condemnation and to forfeiture to the United States for its use in accordance with Title 18, United States Code, Section 981(a)(1)(A).

52. The defendant $959,333.87 in currency is presently deposited within the jurisdiction of this Court.

WHEREFORE, the United States prays that due process issue to enforce the forfeiture of the defendant $959,333.87 and that due notice be given to all interested parties to appear and show cause why said forfeiture should not be declared.

DATED: August 31, 2015

LAURA E. DUFFY
United States Attorney

s/Bruce C. Smith
BRUCE C. SMITH
Assistant U.S. Attorney